THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP RULE 77(d).

___ Priority
_X_ Send
___ Clsd
_X_ Enter
_NO_ JS-5/JS-6
___ JS-2/JS-3

FILED
CLERK, U.S. DISTRICT COURT
JUN 1 2 2002
6-10-02
CENTRAL DISTRICT OF CALIFORNIA
BY_____ DEPUTY

ENTERED
CLERK, U.S. DISTRICT COURT
JUN 1 1 2002
CENTRAL DISTRICT OF CALIFORNIA
BY_____ DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EDUARDO MORENO LAPARADE,

      Plaintiff,

      v.

COLUMBIA PICTURES INDUSTRIES,
INC., a California
corporation; MARIO MORENO
IVANOVA, an individual, and as
Executor of THE ESTATE OF
MARIO MORENO REYES,

      Defendants.

AND RELATED COUNTERCLAIMS.

Case No. CV 97-0615 WJR (CTx)

PHASE II BENCH TRIAL:
FINDINGS OF FACT AND
CONCLUSIONS OF LAW

_✓_ Docketed
_✓_ Copies / Ctd Sent
_NO_ JS - 5 / JS - 6
___ JS - 2 / JS - 3
___ CLSD

This matter was heard by the Court in a second phase of a

bench trial conducted on August 7, 2001 and February 26, 2002

through March 19, 2002.  Timothy C. Riley appeared on behalf of

Defendant Mario Moreno Ivanova ("Ivanova").  Henry J. Tashman and

Jennifer L. Brockett appeared on behalf of Defendant Columbia

Pictures Industries, Inc. ("Columbia").  Based on the evidence

presented at trial, the post-trial briefs, the parties' proposed

1  findings of fact and conclusions of law, and the applicable law,

2  the Court now makes the following Findings of Fact and

3  Conclusions of Law.  <u>See</u> Fed. R. Civ. P. 52.

4                          **FINDINGS OF FACT**

5  1.   This action primarily is one for interpleader and

6  declaratory relief regarding who owns the worldwide intellectual

7  property rights and related rights, in whole or in part, for

8  thirty-four motion pictures ("Motion Pictures") starring Mario

9  Moreno Reyes, better known by his stage name "Cantinflas."

10  2.   This action commenced on January 30, 1997, when Eduardo

11  Moreno Laparade ("Laparade"), Cantinflas' nephew, filed a

12  complaint seeking declaratory relief against Columbia and

13  Ivanova, individually and as executor of the estate of

14  Cantinflas.   Laparade claimed he held certain rights in the

15  Motion Pictures through succession.

16  3.   In response to Laparade's Complaint, Columbia filed cross-

17  claims and counterclaims for declaratory relief and statutory

18  interpleader against Laparade, Ivanova, Joyce Jett, Natasha

19  Gelman and Authors' Rights Restoration Corp. ("ARRC").

20  4.   Joyce Jett was Cantiflas' common-law ex-wife.  The late

21  Natasha Gelman was the widow of Jacques Gelman ("Gelman").

22  Jacques Gelman was Cantinflas' business partner and part-owner of

23  the various production companies that produced the Motion

24  Pictures.   Janet Neschis is the Executor of the Gelman Estate,

25  which was substituted into this action following the passing of

26  Ms. Gelman.   Ms. Neschis is a partner in the law firm of

27

28                                    2

1 McLaughlin & Stern.   Mrs. Neschis also is the daughter of Sidney

2 E. Cohn, who represented Cantinflas, Gelman and their production

3 companies in a number of matters.

4 5.   Prior to Phase I of trial, Columbia and ARRC settled with

5 all parties except Ivanova.   Pursuant to the settlement,

6 Laparade, Jett and Gelman, inter alia, assigned their rights, if

7 any, in the Motion Pictures to Columbia, and were thereafter

8 dismissed from the case.   ARRC's dispute with Columbia and

9 Ivanova was tried in Phase I of trial.

10 6.   Phase I of the bench trial was conducted on April 24, 2001

11 through May 2, 2001.   On May 30, 2001, the Court held that "under

12 the Collaboration Doctrine, and consequently under the laws of

13 Mexico, the producer of a film is the author of the film. . . .

14 Consequently, it is only the producers or the successors to the

15 producers who are eligible to any restoration rights in the

16 Motion Pictures."   (May 30, 2001 Ord. at 12.)

17                             **The Motion Pictures**

18 7.   Columbia has a long history of business dealings, dating

19 back to 1946, with Cantinflas, Gelman, and the various entities

20 partly owned and/or controlled by Cantinflas and Gelman,

21 including Posa Films, S.A. ("Posa"), Posa Films Internacional

22 S.A. ("PFI"), Cantinflas Films, S.A. ("Cafisa"), Rioma Films,

23 S.A. ("Rioma"), Alfa Films, S.A. ("Alfa"), and Telemont Anstalt

24 Vaduz, a Liechtenstein entity ("Telemont").   Most or all of these

25 entities have been dissolved and liquidated.

26 8.   The Motion Pictures at issue in this litigation can be

27

28                                          3

1  categorized into three groups based on their producers.

2  9.   Posa produced twenty of the motion pictures ("20 Motion

3  Pictures"), which, in order of first date of release in Mexico,

4  are titled as follows: (1) <u>Ni Sangre Ni Arena</u>, (2) <u>El Gendarme</u>

5  <u>Desconocido</u>, (3) <u>Los Tres Mosqueteros</u>, (4) <u>El Circo</u>, (5) <u>Romeo y</u>

6  <u>Julieta</u>, (6) <u>Gran Hotel</u>, (7) <u>Un Dia Con El Diablo</u>, (8) <u>Soy un</u>

7  <u>Profugo</u>, (9) <u>A Volar Joven</u>, (10) <u>El Supersabio</u>, (11) <u>El Mago</u>,

8  (12) <u>El Portero aka Puerto Joven</u>, (13) <u>El Siete Machos</u>, (14) <u>Si</u>

9  <u>Yo Fuera Diputado</u>, (15) <u>El Bombero Atomico</u>, (16) <u>El Senor</u>

10  <u>Fotografo</u>, (17) <u>Cabellero a la Medida</u>, (18) <u>Abajo El Telon</u>, (19)

11  <u>El Bolero de Raquel</u>, and (20) <u>Sube y Baja</u>.   The 20 Motion

12  Pictures were released in Mexico between 1941 and 1959.

13  10.   PFI produced six of the motion pictures ("6 Motion

14  Pictures"), which, in order of first date of release in Mexico,

15  are titled as follows: (1) <u>El Analfabeto</u>, (2) <u>El Extra</u>, (3)

16  <u>Entrega Inmediata</u>, (4) <u>El Padrecito</u>, (5) <u>El Senor Doctor</u>, and (6)

17  <u>Su Excelencia</u>.   The 6 Motion Pictures were released in Mexico

18  between 1961 and 1967.

19  11.   Various production companies produced the last eight films

20  at issue in this litigation ("8 Motion Pictures").   In order of

21  release in Mexico, PFI produced the first three: <u>Por Mis</u>

22  <u>Pistolas</u>, <u>El Profe</u> and <u>Un Quijote Sin Mancha</u>.   Rioma produced the

23  next three: <u>Conserje en Condominio</u>, <u>El Ministro y Yo</u> and <u>El</u>

24  <u>Patrullero 777</u>, and it co-produced one picture -- <u>Don Quijote</u>

25  <u>Cabalga de Neuvo</u> -- with Oscar Producciones Cinematografica, S.A.

26  Lastly, Cafisa produced the last of the 8 Motion Pictures, <u>El</u>

27

28                                    4

1 | Barrendero.[1]

2 | **The 20 Motion Pictures**

3 | 12.  Prior to 1959 and 1960, Posa -- the producer of each of the

4 | 20 Motion Pictures -- owned all right, title and interest to the

5 | 20 Motion Pictures, including all physical elements of the Motion

6 | Pictures.

7 | 13.  Sidney E. Cohn, the attorney who represented Cantinflas,

8 | Gelman and Posa, planned and negotiated that Columbia would

9 | purchase the 20 Motion Pictures through a series of transfers.

10 | The basic structure of the sale was outlined in a November 18,

11 | 1959 Memorandum from Sidney E. Cohn to Columbia founder and board

12 | member Samuel Briskin.  Although the details of the Buyout differ

13 | from that which was envisioned in Mr. Cohn's Memorandum, the

14 | basic structure was effectuated.

15 | 14.  Specifically, in two agreements, dated January 15, 1959 and

16 | January 18, 1960, Posa sold all of its rights in the 20 Motion

17 | Pictures to Patientia Anstalt ("Patientia"), a Lichtenstein

18 | entity, as well as title to the film elements (negatives, prints,

19 | etc.) that embodied the works (hereinafter referred to as Film

20 | Rights), for payment in U.S. dollars.  These contracts were found

21 | in Columbia's files and in Mr. Cohn's files in New York.  Ivanova

22 | did not find copies of these contracts in Posa's files in Mexico.

23 | 15.  In the first agreement, dated January 15, 1959, Posa

24 | ———————————

25 | [1]    Laparade's initial pleadings asserted claims as to 39
26 | films.  Columbia and Ivanova assert claims only as to 34 of those
   | films; the remaining five films (No Te Enganes Corazon, Asi Es Mi
27 | Tierra, Aguila o Sol, El Signo De La Muerta and Ahi Esta El
   | Detalle) are not at issue here.

28 |

1 transferred ten of the 20 Motion Pictures to Patientia, which

2 were: (1) El Mago, (2) El Portero, (3) El Siete Machos, (4) El

3 Bombero Atomico, (5) Si Yo Fuera Diputado, (6) El Senor

4 Fotografo, (7) Caballero A La Medida, (8) Abajo El Telon, (9) El

5 Bolero De Raquel and (10) Sube y Baja.  Article 1 of that

6 agreement states:

7           We, hereinafter referred to as "Seller"

8           warrant and represent to you, hereinafter

9           referred to as "Purchaser" that Seller [Posa]

10          is the producer of and the sole and exclusive

11          owner of the full, complete, unencumbered and

12          marketable title of the ten (10) motion

13          pictures listed in Article 2 hereof, and of

14          each and all the rights, licenses and

15          privileges hereinafter sold, assigned and

16          transferred to Purchaser hereunder, and that

17          Seller as the full right, power and authority

18          to enter into and perform this agreement.

19 16.  Article 3 of the agreement also expressly transfers full

20 ownership of the intellectual property rights, as well as the

21 film elements, from Posa to Patientia:

22          Seller [Posa] hereby irrevocably sells,

23          assigns, transfers and sets over to Purchaser

24          [Patientia] said Ten Pictures, together with

25          full, complete, unencumbered and marketable

26          title thereto, as well as like title to all

27

28                                6

negatives, prints, and other physical

properties thereof, as well as like in title

in and to any and all literary, dramatic, and

musical material used in said pictures or

acquired in connection with the production

thereof, including without limitation all of

the following:

. . .

b)   The original picture negatives of

said pictures.

c)   All negatives, prints and other

physical properties . . ..

g)   All copyrights and rights to obtain

copyrights and renewals thereof, . . . [and]

h)   All other rights of every kind and

nature which are now owned or controlled by

Seller [Posa] in and to said Ten Pictures or

in the material from which the same was

produced together with all of Seller's

[Posa's] right, title and interest in and to

the above.

17.   Article 7 further states that Patientia was acquiring "the

copyright and the right to obtain, renew and extend copyright" in

the 10 Motion Pictures "free and clear of all claims on behalf of

any third party."

18.   This agreement was signed by Cantinflas on behalf of Posa

7

1    and Cantinflas also signed a "sub-joinder" in the agreement,

2    personally ratifying the transfer.

3    19.   In the second agreement dated January 18, 1960, Posa

4    transferred all of its rights in the remaining ten of the 20

5    Motion Pictures to Patientia, which were: (1) <u>Soy un Profugo</u>, (2)

6    <u>A Volar Joven</u>, (3) <u>El Supersabio</u>, (4) <u>El Circo</u>, (5) <u>Romeo y</u>

7    <u>Julieta</u>, (6) <u>El Gendarme Desconocido</u>, (7) <u>Ni Sangre Ni Arena</u>, (8)

8    <u>Los Tres Mosqueteros</u>, (9) <u>Gran Hotel</u> and (10) <u>Un Dia Con El</u>

9    <u>Diablo</u>.

10   20.   The relevant language of the January 18, 1960 agreement is

11   identical to that contained in the January 15, 1959 agreement.

12   21.   Again, this agreement was signed by Cantinflas on behalf of

13   Posa and Cantinflas also signed a "sub-joinder" in the agreement,

14   personally ratifying the transfer.

15   22.   By an agreement dated February 23, 1960, Patientia sold the

16   Film Rights in the 20 Motion Pictures to Movag Establishment

17   Vaduz, also a Liechtenstein entity ("Movag"), for payment in U.S.

18   dollars.   The agreement specifically references the two Posa-

19   Patientia agreements and states that Patientia holds "full,

20   complete, unencumbered and marketable title in each of the 20

21   Motion Pictures," and is transferring "full, complete,

22   unencumbered and marketable titles to said 20 Motion Pictures,

23   all other rights licenses and privileges sold, granted and

24   transferred to [Patientia] under the Buyout Agreements, with the

25   benefit of all warranties and representations made to us by Posa

26   thereunder."

27

28                                    8

23.  This Patientia-Movag agreement was found in Columbia's files and in Mr. Cohn's files in New York.  Ivanova did not find a copy of this contract in Posa's files in Mexico.

24.  By an agreement dated February 24, 1960, Movag sold the Film Rights in the 20 Motion Pictures to Showthern, Ltd., a U.K. corporation ("Showthern").  This agreement references all three prior agreements, and states that Movag transferred to Showthern all "licenses and privileges under the Buyout Agreements in, to, or in connection with said 20 Motion Pictures, including without limitation, full, complete and marketable title to said motion pictures . . .."'  The agreement indicates it was witnessed by Mr. Cohn, Cantinflas' attorney.

25.  By an agreement dated March 10, 1960, Showthern sold the Film Rights in the 20 Motion Pictures to Columbia Pictures Corporation, Ltd. ("CPCL").  At the time, CPCL was a British subsidiary of Columbia Pictures Corporation ("CPC"), which, in turn, is the corporate predecessor to Columbia; CPCL currently is an affiliate of Columbia.

26.  Again, the Showthern-CPCL agreement references the prior transfer agreements and states "the Assignor [Showthern] hereby sells and assigns unto the assignee ALL THOSE said film rights comprised in and assigned by the Rights Agreements and all other (if any) the benefit of such Agreements in so far as the same has passed to the Assignor TO HOLD the same unto the Assignee [CPCL] absolutely . . .."

27.  Although the document has only type-written signatures,

1  Kenneth Maidment -- who, at the time of this transaction, was

2  CPCL's secretary -- credibly testified that the agreement was

3  fully-executed by all signatories and sealed, and that the

4  document presented into evidence represents a conformed copy of

5  the agreement.  Notwithstanding a diligent search, Columbia was

6  unable to locate a copy of the agreement with signatures and

7  seal.  The Court rejects the suggestion this was merely a draft

8  document.

9  28.  On May 27, 1987, CPCL signed a Power of Attorney appointing

10  Columbia to be its "true and lawful attorney and/or agent,"

11  thereby empowering Columbia, in CPCL's "name, place and stead" to

12  "procure and maintain the protection of [CPCL's] copyright" in

13  all films owned by CPCL, and to "appoint attorneys and counsel to

14  represent [CPCL] in the protection and enforcement of such

15  copyright and proprietary rights . . .."

16  29.  On March 13, 2002, CPCL transferred the Film Rights in the

17  20 Motion Pictures to Columbia, via a _nunc pro tunc_ assignment

18  effective as of March 11, 1960.

19  30.  Numerous other documents corroborate this chain of title.

20  31.  Ivanova relies upon a 1963 agreement transferring title to

21  the 20 Motion Pictures from Posa to Cantinflas to support his

22  claim of ownership of the 20 Motion Pictures.  First, Posa sold

23  the same 20 Motion Pictures to Patientia in 1960 -- three years

24  prior -- so Posa would not have had anything to transfer in 1963.

25  Second, Ivanova's testimony was contradictory regarding the

26  circumstances under which this agreement was located.  Third,

27

28                    10

1  unlike the other agreements transferring rights in the films,

2  Ivanova's 1963 agreement was not found in Mr. Cohn's, Cantinflas'

3  attorney, files.  And fourth, this transfer is not corroborated

4  by any other documents.  In fact, it is contradicted by dozens of

5  documents.  Due to the numerous factors undermining the validity

6  and authenticity of this 1963 transfer, the Court need not

7  specifically address the authenticity of the signatures.

8  32.  The Court finds Ivanova's 1963 transfer agreement to not be

9  reliable, credible evidence sufficient to support Ivanova's claim

10  of ownership.

11  33.  Ivanova testified that he is in possession of all of the

12  original picture negative reels for 33 of the 34 Motion Pictures,

13  which he testified he inspected in early 2002.

14  34.  Ivanova's testimony was strongly contradicted by two

15  witnesses:  Vanessa O'Kelley, an Inspector Printer in the Motion

16  Picture Conservation Center of the Library of Congress, and

17  Grover Crisp, Sony Pictures Entertainment's Vice President of

18  Asset Management and Film Restoration.

19  35.  Ms. O'Kelley testified that the Library of Congress

20  possessed original picture negatives for five of the 20 Motion

21  Pictures.  Ms. O'Kelley was a credible witness, experienced in

22  the matters to which she testified, and the Court finds her

23  testimony believable.

24  36.  Mr. Crisp testified, with reference to a computer database

25  printout maintained in the ordinary course of business, that

26  Columbia possessed film elements for all 34 Motion Pictures,

27

28                                    11

1  including original picture negatives for 16 of the films.

2  Notwithstanding the errors contained in the database printout,

3  the Court finds Mr. Crisp to have been a credible witness,

4  experienced in the matters to which he testified, and the Court

5  finds Mr. Crisp's testimony believable.

6  **The 6 Motion Pictures**

7  37.   Prior to 1968, PFI -- the producer of the 6 Motion Pictures

8  -- owned all right, title and interest to the 6 Motion Pictures,

9  including all physical elements of the 6 Motion Pictures.

10  38.   Prior to January 31, 1968, Telemont acquired from PFI all

11  non-U.S. rights in the 6 Motion Pictures, and Alfa acquired from

12  PFI all U.S. rights in the 6 Motion Pictures.   These transfers

13  were not disputed.

14  39.   On January 31, 1968, through two separate agreements,

15  Telemont and Alfa then sold the rights in the 6 Motion Pictures

16  to "Columbia Pictures Corporation," the predecessor to Columbia.

17  A copy of this contract was found in Columbia's files and in Mr.

18  Cohn's files in New York.   Ivanova did not find a copy of this

19  contract in PFI's files in Mexico.

20  40.   Both of these contracts contain language similar to that

21  which is in the agreements relating to the 20 Motion Pictures.

22  41.   Numerous other documents corroborate this chain of title.

23  42.   Ivanova relies upon a 1972 agreement transferring title to

24  the 6 Motion Pictures (as well as 3 of the 8 Motion Pictures)

25  from PFI to Cantinflas to support his claim of ownership of the 6

26  Motion Pictures.

27

28  12

43.   The Court finds this evidence to be incredible for the same reasons the Court finds Ivanova's 1963 agreement to be not credible, and finds this evidence is not sufficient to support Ivanova's claim of ownership.

**The 8 Motion Pictures**

44.   The last set of motion pictures at issue in this litigation are the 8 Motion Pictures.   The interests Columbia and Ivanova claim in the 8 Motion Pictures are different from those asserted in the other 26 Motion Pictures.   Specifically, Ivanova contends that he owns the 8 Motion Pictures as the putative successor of Cantinflas.   Columbia, on the other hand, asserts more limited rights in the 8 Motion Pictures, including distribution rights and rights of first refusal.[2]

45.   Ivanova's asserted ownership claim in three of the 8 Motion Pictures (Por Mis Pistolas, Un Quijote Sin Mancha and El Profe) rests on a 1972 agreement transferring the rights in these films from PFI to Cantinflas, which this Court finds to be not credible.

46.   Ivanova did not present any evidence to support his ownership claim in the remaining five films: Don Quijote Cabalga de Nuevo, Conserje en Condominio, El Ministro y Yo, El Patrullero 777 and El Barrendero.

47.   The Court need not make findings as to Columbia's interests in the 8 Motion Pictures for the reasons stated below.

---

[2]     Columbia, however, makes no claim of rights as to the film Don Quijote Cabalga de Nuevo.

1                          **CONCLUSIONS OF LAW**

2    48.   To the extent any of the following conclusions of law are

3    deemed to be findings of fact, or mixed questions of law and

4    fact, they are incorporated into the "Findings of Fact."

5    Likewise, to the extent any of the foregoing findings of fact are

6    deemed to be conclusions of law, they are incorporated herein.

7    49.   The Court has subject matter jurisdiction over this action

8    pursuant to (i) its ongoing jurisdiction to enforce the 1994

9    Stipulated Judgment, (ii) Statutory Interpleader, because there

10   are diverse claimants as to the interpleader _res_ that Columbia

11   has deposited with the Court, and (iii) the Copyright Act,

12   Chapter 17 of the United States Code.

13   50.   As to the 20 Motion Pictures, Posa was the author and owner

14   of all right, title and interest to the 20 Motion Pictures.

15   51.   Through the various agreements referenced above, Posa

16   transferred indirectly to Showthern the Film Rights in the 20

17   Motion Pictures.   Each of the documents reflecting these

18   transactions satisfy the writing requirement of 17 U.S.C. § 204.

19   52.   Because Posa initially transferred the Film Rights in the 20

20   Motion Pictures to Patientia in 1959 and 1960, Posa could not

21   have transferred those same 20 Motion Pictures to Cantinflas in

22   1963.   Therefore, even assuming Ivanova's 1963 transfer agreement

23   was authentic, it was an ineffective transfer of rights because,

24   at that time, Posa had nothing to transfer.

25   53.   The Court concludes that the March 10, 1960 Showthern-CPCL

26   Buyout was executed and constituted an effective transfer.

27

28                                  14

1  Furthermore, this conformed-copy agreement satisfies 17 U.S.C. §

2  204(a).

3  54.  Notably, although Ivanova most strongly takes issue with the

4  Showthern-CPCL link in the chain of transfers from Posa

5  indirectly to Columbia, a finding that the Showthern-CPCL

6  transfer was not properly effectuated would not support Ivanova's

7  claim of ownership; it would only establish that Showthern, not

8  Ivanova and not Columbia, owns the films.  Therefore,

9  notwithstanding this Court's conclusion that CPCL validly

10  received the Film Rights in the 20 Motion Pictures, a contrary

11  finding would be of little moment.

12  55.  CPCL then effectively transferred the Film Rights in the 20

13  Motion Pictures to Columbia through a Power of Attorney and a

14  nunc pro tunc assignment.

15  56.  Columbia has satisfied its burden to show that it owns the

16  Film Rights in the 20 Motion Pictures.  In contrast, Ivanova has

17  not satisfied his burden to show that he owns the Film Rights in

18  the 20 Motion Pictures.  The Court concludes that Ivanova's

19  evidence regarding possession of the original pictures negatives

20  is legally irrelevant, and, notwithstanding this fact, not

21  credible.

22  57.  As to the 6 Motion Pictures, PFI was the author and owner of

23  all right, title and interest to the 6 Motion Pictures.

24  58.  Prior to 1968, PFI transferred the Film Rights in the 6

25  Motion Pictures to Telemont (non-U.S. rights) and Alfa (U.S.

26  rights).  Each of the documents reflecting these transactions

27

28                                    15

1  satisfy the writing requirement of 17 U.S.C. § 204.

2  59.  On January 31, 1968, Telemont and Alfa sold to Columbia the

3  Film Rights to the 6 Motion Pictures.  Each of the documents

4  reflecting these transactions satisfy the writing requirement of

5  17 U.S.C. § 204.

6  60.  Because PFI transferred the Film Rights in the 6 Motion

7  Pictures to Telemont and Alfa prior to 1968, and they, in turn,

8  transferred the Film Rights in the 6 Motion Pictures to Columbia

9  on January 31, 1968, PFI could not have transferred those same 6

10 Motion Pictures to Cantinflas in 1972.  Therefore, even assuming

11 Ivanova's 1972 transfer agreement was authentic, it was an

12 ineffective transfer of rights because, at that time, PFI had

13 nothing to transfer.

14 61.  Columbia has satisfied its burden to show that it owns the

15 Film Rights in the 6 Motion Pictures.  In contrast, Ivanova has

16 not satisfied his burden to show that he owns the Film Rights in

17 the 6 Motion Pictures.

18 62.  As to the 8 Motion Pictures, the Court concludes that

19 Ivanova's 1972 agreement is not credible, authentic evidence

20 sufficient to support a finding that Cantinflas owned three of

21 the 8 Motion Pictures.

22 63.  Ivanova has not offered any evidence supporting his claim

23 that Cantiflas owned the remaining five of the 8 Motion Pictures.

24 64.  Having failed to demonstrate ownership of the 8 Motion

25 Pictures, Ivanova does not have the power to trigger Columbia's

26 rights, if any, in the 8 Motion Pictures.  Given this conclusion,

27

28                              16

1 | the Court need not make findings or conclusions as Columbia's
2 | rights to the 8 Motion Pictures.
3 | **CONCLUSION**
4 | 1.   Based on the foregoing Findings of Fact and Conclusions of
5 | Law, the Court hereby declares Columbia to be the owner of all
6 | rights, title and interest in the 20 Motion Pictures and the 6
7 | Motion Pictures.   Ivanova holds no ownership interest in the 20
8 | Motion Pictures or the 6 Motion Pictures.   Ivanova's rights, if
9 | any, to receive motion picture participations with respect to
10 | these 26 Motion Pictures as set forth in the 1994 Stipulated
11 | Judgment shall be determined in the action entitled <u>Columbia</u>
12 | <u>Pictures Industries, Inc. v. Ivanova</u>, CV 01-1969 WJR (AJWx).
13 | Ivanova holds no ownership rights in or to the 8 Motion Pictures.
14 | 2.   Because Columbia has demonstrated that its distribution of
15 | the 26 Motion Pictures is in accordance with its ownership
16 | rights, and because Ivanova has not established any right to
17 | distribute the 8 Motion Pictures (or any of the other films), the
18 | Court hereby orders that all funds Columbia has deposited into
19 | the interpleader account plus any accrued interest be immediately
20 | returned to Columbia.
21 | 3.   Because Ivanova has not established his ownership of the 8
22 | Motion Pictures, and, therefore, has no power to trigger any
23 | rights Columbia may have in those films, the Court hereby orders
24 | that the $165,000 that Columbia deposited into the 2001 Court
25 | Account (in accordance with Columbia's purported exercise of its
26 | right of first refusal, triggered by Ivanova under the assumption
27 |
28 | 17

1   Ivanova had the right to trigger such action) be immediately

2   returned to Columbia.

3   4.    Columbia having shown success on the merits, irreparable

4   injury, inadequacy of legal remedies, and that the balance of

5   equities favors injunctive relief, <u>Walters v. Reno</u>, 145 F.3d

6   1032, 1048 (9th Cir. 1998), the Court hereby permanently enjoins

7   Ivanova, his agents, servants, employees and attorneys, and those

8   in active concert or participation with him or them, from

9   licensing, distributing, marketing, offering for distribution or

10   sal, or otherwise exploiting or benefitting from any of the 34

11   Motion Pictures.   This permanent injunction acts to vacate and

12   supersede the preliminary injunctions entered on August 10, 2001

13   and November 21, 2001.

14   5.    Ivanova is hereby ordered to turn over to Columbia all film

15   elements for the 26 Motion Pictures that he may have in his

16   possession, custody or control.

17   6.    Because Ivanova has not established any rights in the 8

18   Motion Pictures, the Court hereby orders that any film elements

19   for the 8 Motion Pictures that Ivanova may have in his

20   possession, custody or control be turned over to the Court, to be

21   held at Consolidated Film Industries ("CFI"), at Columbia's

22   expense.   No party shall have access to these film elements

23   absent prior order from this Court.

24   7.    With regard to the film canisters stored at CFI pursuant to

25   this Court's March 15, 2002 Order, the Court hereby vacates that

26   order subject to the following:   Columbia and Ivanova shall, on

27

28                                 18

an agreed upon date no later than 60 days from the entry of these Findings of Fact and Conclusions of Law, jointly inspect the contents of the film canisters. Any film elements belonging to the 26 Motion Pictures shall be released to Columbia. Any film elements belonging to the 8 Motion Pictures shall be maintained in accordance with paragraph 6, above. Columbia's $1.00 security deposited with the Court pursuant to the March 15, 2002 Order shall be returned to Columbia.

8.   With regard to attorneys' fees and costs, the Court hereby orders the parties to submit briefing on the issue pursuant to the following schedule:  Columbia shall personally serve and file its briefing within 30 days from entry of these Findings of Fact and Conclusions of Law.  Ivanova shall personally serve and file its response within 14 days of service of Columbia's briefing. Columbia shall personally serve and file any reply within 7 days of service of Ivanova's response.

9.   Additionally, the contempt award of $15,413.72 ordered by this Court on February 15, 2002, shall be paid immediately by Ivanova to Columbia.  The Court declines to require Ivanova to post a security for remaining sanctions and costs.  The hearing previously set for June 10, 2002, is hereby taken off calendar.


IT IS SO ORDERED.

DATED: June __7__, 2002

WILLIAM J. REA
United States District Judge

19